LEON A. CANNIZZARO, Jr., Judge.
11 This case involves a workers’ compensation claim by Brenda Singleton against Payne Service, Inc., also known as Payne Synergies (“Payne”). Ms. Singleton alleged that she suffered injuries from inhaling chemical fumes while working at a temporary job for Payne at the Chalmette Refinery in St. Bernard Parish. Payne contested Ms. Singleton’s claim for workers’ compensation. After a trial, Ms. Singleton’s claim was denied. She is now appealing the decision of the workers’ compensation judge.
*770 STATEMENT OF FACTS

Ms. Singleton’s Testimony

Ms. Singleton alleged that she suffered severe nosebleeds and other physical problems as a result of breathing benzene and hydrogen sulfide fumes at the Chalmette Refinery. She had worked at the refinery for approximately four days at a temporary job when the incident occurred.
Ms. Singleton represented herself at the trial. She testified that she was | ^working for Payne on a turnaround job.[1] Ms. Singleton testified that she started the turnaround job on March 8, 2004. On March 10, according to Ms. Singleton’s testimony, she became “very ill” while she was working. She was vomiting and suffering from “excessive nosebleeds,” but she felt better that night. The next morning, which was March 11, Ms. Singleton went to work, but she began to experience the same symptoms that she had experienced the previous day.
When Ms. Singleton began feeling ill on March 11, she called her supervisor and asked him to come to the area of the refinery where she was on duty. Someone came immediately and relieved Ms. Singleton of her duties. She stated that she asked to see the medical personnel on the site. Two men arrived. She assumed that the men were going to take her to visit the medical personnel. Instead, according to Ms. Singleton’s testimony, the two men attempted to escort her off of the refinery premises.
Ms. Singleton, however, refused to be escorted off of the premises. She then saw some foremen who worked for Exxon Mobil,[2] and she asked them to get her medical attention. The foremen did not respond, but Leah Payne, one of the Payne owners, sent two men with a scooter to get Ms. Singleton, but Ms. Payne then personally came in her car to get Ms. Singleton.
Ms. Singleton said, “I get into Ms. Payne’s car, and we driving [sic] and some van was following her with an African-American guy in the van saying very bad slurs.” Ms. Singleton said that instead of going west toward LaPlace, where |sMs. Payne said that she was taking Ms. Singleton to the doctor, Ms. Payne was driving east. When Ms. Singleton questioned Ms. Payne about this, Ms. Payne replied, “Just be patient and hold on.” Ms. Singleton continued her testimony as follows:
So, as we drove, we wind [sic] up way over in New Orleans East past Bullard. That was east. And instantly ... And I panicked. The guy in the van was still behind us.... I panicked; I didn’t un- ' derstand what was going on. I jumped out of her car.
Ms. Singleton then stated that she hitchhiked from Bullard Avenue to the Chal-mette office of her physician, Dr. Maynard Garrett. According to Ms. Singleton, when Dr. Garrett could not stop her nosebleed, he sent her to a hospital, Chalmette Medical Center. At the hospital “all kind of tests” were conducted, and Ms. Singleton said that she “was extensively bleeding and they couldn’t stop the bleeding.” Ms. Singleton further testified that at one point the bleeding stopped, and she went *771 home. According to Ms. Singleton’s testimony, the medical center personnel believed that she had been exposed to a caustic chemical.
Ms. Singleton further testified that when she arrived at Chalmette Medical Center, she told the medical personnel that she believed that she had been exposed to some type of chemical. Ms. Singleton also stated that Dr. Garrett had immediately identified the cause of her illness. She said, “[T]hey did indeed examine me and saw that it was some kind of caustic inhalation that I had to cause this reaction.”
Ms. Singleton returned home after she was discharged from Chalmette Medical Center. That night the “bleeding started again.” She testified that she went to United Medical Center that night, where she was treated, and the bleeding stopped. Ms. Singleton testified that United Medical Center was the second 1 ¿hospital that she had visited that day. She said that she remained at United Medical Center for about two hours and then returned home after the bleeding was under control. Ms.. Singleton testified that after she got home, the bleeding resumed, and she then returned to Chalmette Medical Center. After being treated again at Chalmette Medical Center, she returned home. Ms. Singleton testified that she had been to two hospitals, Chalmette Medical Center and United Medical Center, on the same day, and she had been to one of them, Chalmette Medical Center, twice that day.
Ms. Singleton testified that the bleeding resumed the next day and that she returned to Dr. Garrett’s office a few days after her injury had occurred. ‘According to Ms. Singleton’s testimony, Dr. Garrett performed surgery that stopped the bleeding. She said that Dr. Garrett told her that “I was heavily exposed to-some kind of toxic chemical.”
The day after the surgery Ms. Singleton “started to have ... pains ... all in my body and stuff.” She said that she went to United Medical Center where she was treated. She further stated that she was told that “I need to go follow up on that treatment because they are more than sure that it could be related to my injury.” Ms. Singleton continued her treatment with a chiropractor, who “found findings similar stating that my injury was definitely related to the chemical injury.” The chiropractor treated Ms. Singleton for back pains.
Ms. Singleton also visited a “pulmonary specialist” at Touro Infirmary. When the specialist contacted Ms. Payne, according to Ms. Singleton’s testimony, Ms. Payne denied that Ms. Singleton’s respiratory illness was related to the injury that allegedly occurred at the Chalmette Refinery. ■Ms. Singleton underwent pulmonary testing, but Ms. Singleton testified that she had to quit seeing the ^pulmonary specialist, because she could not pay him and ■because Ms. Payne refused to authorize ■Payne to pay him.
After Ms. Singleton stopped seeing the pulmonary specialist, she returned to Dr. Garrett, who said, “Ms. Singleton, I still see ... a scar that stems from the chemical injury that is ulcerated.” He told her that she had an ulcerated scar that would take a long period of time to heal and that she would have to take antibiotics for the wound to heal. Ms. Singleton then testified that because Payne would not pay for her antibiotics, she did not have the money to buy them.

Deposition Testimony of Scott Andrew Goodwin

The deposition of Scott Andrew Goodwin was introduced into evidence at the trial. Mr. Goodwin testified that he was an employee of Exxon Mobil at the time that Ms. *772 Singleton was allegedly exposed to caustic chemicals. He further testified that the Chalmette Refinery, a petroleum refinery, was owned jointly by Exxon Mobil and another party in a “joint cooperative.” Mr. Goodwin said that he worked in the safety field as a “field response group supervisor.” As such, he was responsible for emergency response programs. Additionally, Mr. Goodwin stated that he was involved with accidents that occurred at the refinery, including accidents involving persons working for subcontractors such as Payne.
Mr. Goodwin testified that subcontractors working at the refinery were required to have safety meetings. Mr. Goodwin said that he was familiar with Payne, and he described the type of work that Payne did at the Chalmette Refinery.
Mr. Goodwin further stated that if there were a chemical release of some type at the Chalmette Refinery, an alarm system would sound alarms, the area affected by the release would be evacuated, and then the appropriate personnel would check the area and determine what had happened. Written reports were | ^generated whenever there was a chemical release. If the alarm system indicated that there had been a chemical release, when, in fact, no chemical was released, the “negative” release would not be documented. If there were a possibility that benzene or hydrogen sulfide had been released, meters would be used to determine if the chemical were present. A report would be made only when a chemical was detected.
At the time that Ms. Singleton experienced her medical problems, she had been working on a turnaround at the refinery. Mr. Goodwin said that he was personally familiar with her case. He produced a medical response report that documented Ms. Singleton’s medical complaints. A paramedic employed by a third party medical contractor that provided safety technicians and paramedics for turnarounds at the Chalmette Refinery had prepared the report.
The report reflected that Ms. Singleton had complained of smelling benzene. The paramedic who examined Ms. Singleton found nothing wrong with her. The emergency medical report prepared by the paramedic indicated that Ms. Singleton complained that she had been smelling benzene fumes, that she had vomited the previous night, and that she had suffered from nausea. The report also stated that Ms. Singleton was complaining of vomiting and diarrhea as well as chills. The report further said that at the time she was examined, Ms. Singleton had not been feeling well as a result of her being “25 ft from H2S [hydrogen sulfide].” The report finally stated that Ms. Singleton wanted to see a company doctor and that she refused to sign the emergency medical report.
At his deposition, Mr. Goodwin also identified a report prepared by Shane Goodman, who was the safety representative for Payne during the turnaround at the Chalmette Refinery. The report by Mr. Goodman documented that on the day 17of Ms. Singleton’s alleged injury, he received a call from Payne, because an employee felt ill. The employee, Ms. Singleton, was complaining of “flu like symptoms.” Mr. Goodman’s impression was that Ms. Singleton had “the flu or a stomach viris [sic].” Thus, Mr. Goodman explained to Ms. Singleton that there was no doctor at the refinery who could treat her for the flu or for stomach problems. According to Mr. Goodman’s report, Ms. Singleton refused to leave the refinery without seeing medical personnel. Therefore, she was taken to the paramedic for an examination.
*773 Mr. Goodwin testified that in response to Ms. Singleton’s complaints, “[w]e talked to her, found out where they thought she was working, went out and gas tested the area and didn’t find anything of a release at that point.” Mr. Goodwin’s testimony indicated that the investigation was done the day after Ms. Singleton complained of being ill. The investigation showed no evidence of benzene or hydrogen sulfide contamination. Mr. Goodwin also stated that he did not know of any person who complained of problems regarding a chemical release at the time that Ms. Singleton became ill.
Finally, Mr. Goodwin ■ testified that Payne sent a letter to the Occupational Safety and Health Administration of the United States Department of Labor (“OSHA”) in response to a complaint that had been filed by Ms. Singleton in connection with her alleged exposure to harmful chemicals. Although Mr. Goodwin stated that Exxon had no letters in its file responding to OSHA, the record in the instant case included a letter from OSHA that was introduced into evidence by Ms. Singleton. The letter was written to Ms. Singleton, and the letter said that Payne had advised OSHA that the incident involving Ms. Singleton had |sbeen investigated and that “OSHA feels the case can be closed on the grounds that the hazardous conditions have been corrected (or no longer exist).”

Medical Records

Copies of a number of medical records were introduced into evidence at the trial.[3] The record contained a statement of conditions of admission and treatment, a triage assessment report, an emergency department physician record, the emergency department nursing record, aiid emergency room discharge instructions, all from Chal-mette Medical Center. All of the records were dated March 11, 2004.
One part of the records from Chalmette Medical Center indicated that the final diagnosis was “nose bleed.” The records also reflected that Ms. Singleton had a diagnosis of “(1) epistaxis by history’ (2) H2S inhalation by history (3) anemia.”[4] The triage assessment indicated that the patient’s chief complaint in the patient’s own words was “[n]ose [breeding” and that Ms. Singleton stated that her “nose started bleeding yesterday [March 10, 2004] but stopped.” The assessment then stated that “[breeding started again today, more heavily.” The assessment showed that Ms. Singleton was treated by Dr. Garrett about an hour prior to her arrival at Chalmette Medical Center and that he referred her to the emergency room. Finally, the triage assessment reported that Ms. Singleton stated that she was exposed to “Benzene and H2S x 3 days.”
Also included in the medical records that were introduced into evidence was an emergency department chart from Bywa-ter Hospital of New Orleans. The chart states that Ms. Singleton was admitted to the hospital on March 12, 2004, | acomplaining of a frontal headache and nosebleeds occurring over the past two days.
There were three documents that were typed on Dr. Garrett’s letterhead that were included in the medical evidence contained in the record. One of the documents was the operative report for a procedure that Dr. Garrett performed on Ms. Singleton. A second document was a letter to a referring physician, a Dr. Barnes. *774 A third document was a letter to Dr. Ronald Wyche.
Dr. Garrett’s operative report, which was dated March 16, 2004, reflects that he conducted a fiberoptic examination of Ms. Singleton’s nose. The procedure was described in detail. The examination revealed that Ms. Singleton’s right nasal passage was almost completely blocked by her deviated septum.[5] The operative report also stated:
Patient complaining of severe epistaxis. Patient also complains of inhaling toxic chemical i.e. hydrogen sulfide gas at work and dates nasal pain and bleeding to this etiology. Fiberoptic survey of the nose was carried out to confirm and evaluate this finding.
The letter to Dr. Barnes reported that “Brenda Singleton states she has been having severe nosebleeds since inhaling a caustic substance at her employment.” The date of Ms. Singleton’s visit to Dr. Garrett was noted as March 16, 2004, which was also the date of the letter. The letter confirmed that “Brenda Singleton was seen by Dr. Barnes who suspected epistaxis and patient was referred to our office.”[6] The letter described Dr. Garrett’s examination of Ms. Singleton, including a fiberoptic examination of Ms. Singleton’s nose that revealed that she |inwas suffering from ulceration on the left side of her nasal septum. Dr. Garrett also determined from an x-ray examination that Ms. Singleton had a deviated septum.
The letter to Dr. Wyche related to an office visit to Dr. Garrett on March 28, 2005, which was more than a year after the alleged incident at the Chalmette Refinery. The letter to Dr. Wyche thanked him for requesting a consultation with Dr. Garrett regarding Ms. Singleton. Dr. Garrett’s letter stated that his examination in March 2004 was “compatible with chemical burn to the internal structures of the nose.” The letter also said that “[e]xamination recently revealed ulceration hemorrhage of both sides of her nasal septum.” Dr. Garrett stated in his letter that the condition “was compatible with reinfection of preexisting scar.” The condition was treated with antibiotics and ointments. Finally, the letter stated that Ms. Singleton’s diagnosis was “[t]raumatic injury of internal nasal structures compatible with partially healed thermal or chemical injury.”
' In addition to the records from Dr. Garrett and from the hospitals that Ms. Singleton visited, there were also documents in the record showing that Ms. Singleton had visited both a chiropractor and a physician regarding back pain and breathing problems. According to the records regarding Ms. Singleton’s back pain and breathing problems, she attributed these problems to her alleged exposure to caustic chemicals while she was working for Payne at the Chalmette Refinery. Additionally, a letter written by Timothy J. Kern, a chiropractor, on TeamCare Medical Centers letterhead stated that “[i]n all medical probability, the patient’s signs and symptoms are causally related to the accident of March 12, 2004.” Dr. Kern’s letter was dated September 23, 2004.
_LyDISCUSSION
Standard of Review
In Banks v. Industrial Roofing & Sheet Metal Works, Inc., 96-2840 *775 (La.7/1/97), 696 So.2d 551, 556, the Louisiana Supreme Court stated that “[factual findings in workers’ compensation cases are subject to the manifest error or clearly wrong standard of appellate review.” The Supreme Court further stated that “[i]n applying the manifest error-clearly wrong standard, the appellate court must determine not whether the trier of fact was right or wrong, but whether the factfin-der’s conclusion was a reasonable one.” Id. If there are two permissible views of the evidence in a workers’ compensation case, the factfinder’s choice between the two views can never be manifestly wrong. Id. Therefore, if the factual findings are reasonable in light of the record reviewed in its entirety, the appellate court cannot reverse the case, even if the appellate court would have weighed the evidence differently had the appellate court been the trier of fact. Id.
The standard of review does not depend on the type of evidence presented in the case. The same standard of review applies whether the evidence before the trier of fact consists solely of written reports, records, and depositions or whether there is live testimony from which the trial court judge could observe the demeanor of the witnesses. Alexander v. Pellerin Marble & Granite, 93-1698 (La.1/14/94), 630 So.2d 706, 709-10.
Assignment of Error
Rule 2-12.4 of the Louisiana Uniform Rules — Court of Appeal requires an appellant’s brief to comply with certain requirements. The brief must include, among other things, “a concise statement of the case, the action of the trial court lather eon, a specification or assignment of alleged errors relied upon, the issues presented for review, an argument confined strictly to the issues of the case ... giving accurate citations of the pages of the record and the authorities cited.... ” Rule 2-12.4 further provides that “[a]ll specifications or assignments of error must be briefed.” If they are not briefed, “[t]he court may consider as abandoned any specification or assignment of error which has not been briefed.”
In the instant case, Ms. Singleton has.filed a pro se brief, which does not comport with the requirements of Rule 2-12.4, and it is unclear to us what her specific assignments of error are. It is clear, however, that she does not think that the judgment of the workers’ compensation judge was correct. Because Ms. Singleton is representing herself, we will examine the record using the applicable standard of review to determine whether the judgment of the workers’ compensation judge was reasonable in light of the record in its entirety.
Ms. Singleton, as the plaintiff in the instant case, had the burden of proof. To win her case, she was required to show by a preponderance of the evidence that she was injured and that the injury was caused by an exposure to a harmful chemical while she was working for Payne.
The workers’ compensation judge found that Ms. Singleton did not meet her burden of proof. We have examined the record in the instant case in its entirety, and we cannot conclude that the decision of the workers’ compensation judge was manifestly wrong or clearly erroneous.
The workers’ compensation judge heard the live testimony of Ms. Singleton and was able to observe her demeanor and to assess her credibility. There was also sufficient evidence in the record from which the workers’ compensation judge |13could have reasonably concluded that Ms. Singleton’s version of the facts was not as plausible as the version of the facts presented by Payne.
*776 Ms. Singleton’s testimony emphasized that she was suffering from a severe nosebleed at the time of the alleged incident. There is nothing, however, in the report of the on-site examination of Ms. Singleton by a paramedic employed by an independent company to indicate that Ms. Singleton was suffering from a nosebleed. Additionally, the medical records of Chalmette Medical Center and from Dr. Garrett do not refer to Ms. Singleton actually bleeding from the nose at the time she was being examined. They refer to her statements that she was suffering from severe nosebleeds.
What is clear from the medical records is that Ms. Singleton did have an ulcerated nasal septum and that the cause of the ulceration was the inhalation of a caustic chemical. The ulceration, no doubt, caused Ms. Singleton to have nose bleeds. What is not clear, however, is the source of the caustic chemical. The record is devoid of any evidence, other than the statements of Ms. Singleton, that there was a release of toxic fumes in the area where Ms. Singleton was working at the Chalmette Refinery. Also, the medical conclusion that Ms. Singleton’s problems were the result of exposure to hydrogen sulfide or benzene was based upon the medical history that Ms. Singleton gave. She told the medical personnel that she had been exposed to those chemicals, although at the trial, she testified that she did not know the names of the chemicals to which she had been exposed. She had heard the names hydrogen sulfide and benzene in her safety training classes.
Our review of the record demonstrates that Ms. Singleton was unable to prove by a preponderance of the evidence that she was exposed to chemicals at the | uChalmette Refinery. The Exxon Mobil employee who was responsible for safety at the site testified in a deposition that appropriate tests were conducted after Ms. Singleton complained of being exposed to hazardous chemical fumes and that there was no evidence that any such fumes had been present at the site where Ms. Singleton had been working.
It was Ms. Singleton’s responsibility to present evidence to show that the chemicals were present, and she presented no evidence other than a letter from OSHA stating that an investigation by that agency indicated that any problem with caustic fumes had been corrected at the time of the OSHA investigation. The investigation by OSHA did not prove that there had been a release of fumes, however. It only proved that there was no problem at the time of the investigation.
Ms. Singleton also relies on the factual findings by the administrative law judge who determined that she was not disqualified for unemployment compensation benefits. The unemployment compensation proceeding was a completely different proceeding from the workers’ compensation proceeding, however. The findings of fact in the unemployment compensation proceeding do find that “[biased on the evidence and testimony presented, the claimant suffered nosebleed, headaches, and vomiting after being exposed to chemicals at work.” The decision of the administration law judge, however, states that “[t]he employer was not represented” at the hearing. Thus, the conclusions of the administrative law judge were based solely on Ms. Singleton’s testimony. Additionally, the decision of the unemployment compensation administrative law judge is not binding on the workers’ compensation judge.
|1BOur review of the record in this case shows that the findings by the workers’ compensation judge were reasonable in light of the record in its entirely. There *777 fore, we cannot substitute another judgment for that of the judge.
DECREE
The judgment of the workers’ compensation judge was neither manifestly erroneous nor clearly wrong. The judgment is hereby affirmed.
AFFIRMED.

. In his deposition, which was introduced into evidence, Scott Andrew Goodwin, a field safety supervisor involved in investigating the alleged incident, testified regarding turnaround jobs. He said that ''[a] turnaround is when we do maintenance on a particular part of the refinery.” He. further testified that "[w]e actually take the unit down, don’t put any more feed in the unit, solate it from the rest of the refinery and then go into the pieces of equipment on that unit to do maintenance. ...”

. Exxon Mobil was a co-owner of the Chal-mette Refinery.

. The handwriting on many of the medical records was illegible, so a complete review of the records was not possible.

. Epistaxis is the medical term for nosebleed.

. The nasal septum is the wall that separates the right and left nostrils from each other. A deviated septum occurs when the nasal septum is not evenly centered between the two nostrils.

. Dr. Garrett’s letterhead indicates that he is a specialist in otolaryngology, the medical specialty concerned with the treatment of conditions affecting the ear, nose, and throat.